IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

DAVID P. STAPLETON, in his                    Civ. No. 6:23-cv-01977-AA
capacity as court-appointed
receiver for the receivership
entity, including ZADEH
KICKS, LLC, dba ZADEH
KICKS,

                    Plaintiff,                    **OPINION & ORDER**

        v.

DEADSTOCK LA, INC.; ELY
HALAVI, dba YEEZUS WE
TRUST,

                    Defendants.
_____

AIKEN, District Judge.

        This case comes before the Court on Motions for Summary Judgment filed by

Plaintiff David Stapleton, in his capacity as court-appointed receiver for the

receivership entity, including for Zadeh Kicks, LLC, ECF No. 35, and by Defendants

Deadstock LA, Inc. and Ely Halavi doing business as Yeezus We Trust, ECF No. 41.

For the reasons set forth below, Plaintiff's Motion is GRANTED and Defendants'

Motion is DENIED.  Judgment is for Plaintiff.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## BACKGROUND

Plaintiff David P. Stapleton is the court-appointed receiver for the Receivership Entity, Zadeh Kicks, LLC, doing business as Zadeh Kicks. Stapleton

Decl. ¶ 1.  ECF No. 36.

Defendant Ely Halavi formed Defendant Deadstock LA Inc. ("Deadstock") as an entity in 2021.  Halavi Decl. ¶ 4.  ECF No. 42.  Beginning in May 2021, Halavi "ceased acting individually in the shoe business and thereafter conducted business solely through . . . Deadstock." *Id.*

This case was originally filed in Lane County Circuit Court but was removed to federal court by Defendants on December 29, 2023, based on diversity jurisdiction. ECF No. 1.

## I.    The Zadeh Kicks Scheme

Zadeh Kicks LLC was a sneaker resale company formed and run by Michael Malekzadeh.  Stapleton Decl. ¶ 2.  Malekzadeh was the sole and managing member of Zadeh Kicks.  *Id.*  As will be discussed in greater detail below, Zadeh Kicks functioned as "a classic Ponzi scheme" selling preorders of shoes.[1]  *Id.* at ¶ 7.

On May 19, 2022, Zadeh Kicks filed a petition for voluntary dissolution and appointment of a receiver (the "Petition") in *In re Judicial Dissolution of Zadeh Kicks dba Zadeh Kicks*, Lane County Circuit Court Case No. 22CV16510.  Stapleton Decl. ¶ 3.  The Petition stated that Zadeh Kicks' liabilities exceeded its assets and that it was insolvent.  *Id.*  Stapleton was appointed as the receiver for Zadeh Kicks on May

---

[1] Ponzi schemes are form of fraud with the following characteristics:
 (1) Investors/customers deposited funds with the Ponzi debtor;
 (2) The Ponzi debtor conducted little or no legitimate business contrary to what was represented to investors/customers;
 (3) The purported business operations of the debtor produced little or no profits or earnings; and
 (4) The source of payments to investors/customers was from cash infused by new or existing investors/customers.
Davis Decl. ¶ 5.  ECF No. 37.

20, 2022, and was charged with managing the wind-up and dissolution of Zadeh Kicks "for the benefit of the company's many creditors." *Id.* at ¶ 4. Stapleton was given authority "to take all actions necessary to protect [Zadeh Kicks'] interests or rights to collect any debts owed to or claims held by [Zadeh Kicks] relating to the Receivership Estate, including, if necessary, commencing any legal proceeding, arbitration or mediation, to protect such interests or recover such funds or claims, including, without limitation, collection, claim and delivery, fraudulent transfer, or breach of contract action." *Id.*

As receiver, Stapleton "undertook a forensic accounting review of Zadeh Kicks' finances'" and "took inventory of the company's assets, reviewed all of its bank accounts, credit card statements, Shopify order histories, and other books and records to understand the company's historical cash flow." Stapleton Decl. ¶ 5. The forensic review revealed that, as early as January 2020, the company "was insolvent, not profitable and not a legitimate business." *Id.* at ¶ 6. Stapleton describes the structure of Zadeh Kicks' business as follows:

> Beginning in December 2019, Zadeh Kicks started collecting money from customers for shoes that had not yet been released, and that the company had no means of fulfilling, thereby putting the company in debt that it was incapable of repaying. Although Zadeh Kicks took out loans from banks, Mr. Malekzadeh began using company money to purchase luxury goods for both himself and his partner Bethany Mockerman.

> Zadeh Kicks' model was also financially unstable because it sold preorders of shoes at prices that were less than the shoes could be purchased for from other sources. My team and I found no evidence that Zadeh Kicks had any connection with Nike or any other retailer or shoe manufacturer to obtain bulk purchases of shoes at costs lower than the MSRP retail price. In other words, Zadeh Kicks was selling preorders for less than it could deliver them. Zadeh Kicks would sell large

amounts of preorders below retail, and then would go on a website called Stockx to purchase shoes at retail to fulfill only a small fraction of orders. This was not financially sustainable for the company because Mr. Malekzadeh had to buy shoes at or above retail despite selling them at below retail. Accordingly, the only way for the business to perpetuate operations was to sell more preorders at below market prices to obtain more funds from customers, while also avoiding delivering shoes ordered or refunding orders to most customers.

Stapleton Decl. ¶¶ 6-7.

After his review, Stapleton "concluded that Zadeh Kicks had become a classic Ponzi scheme that relied on future customer deposits to perpetuate the appearance of an actual business," and that it "had been operating as a Ponzi scheme since at least December 2019 when it began to sell more preorders than it could or would fulfill" and that the company "had no legitimate means to generate profit due to its model of buying high and selling low." Stapleton Decl. ¶¶ 7-8.

Zadeh Kicks did not alert customers that it could not fulfill their orders, and "[t]o hide the fact that the company could not fulfill orders, and to give the appearance of being a successful business, Zadeh Kicks would offer to 'buy back' shoes from customers before the preorder shoes' release dates," and the company and the customers would arrive at the sell back price by haggling." Stapleton Decl. ¶ 8. "However, in each of the 'buy back' transactions, Zadeh Kicks would transfer or credit more money back to the customers than what the customers originally paid," but, because the company was insolvent by January 2020, "any transfers of funds as a refund or to 'buy back' preordered shoes came from deposits received by other customers for preorders." *Id.* The buyback price was "largely driven by the customer." *Id.*

The scale of the Zadeh Kicks scheme was immense. Between January 2020 and April 2022, customers deposited over $133 million with Zadeh Kicks, while the company delivered only $10.2 million in shoes.  Davis Decl. ¶ 6.  In an example provided in connection with Malekzadeh's subsequent criminal prosecution, Zahdeh Kicks began selling preorders of Nike Air Jordan 11 Cool Grey sneakers priced at approximately $115 to 200 per pair, while the expected retail price was set at $225 when the sneakers were released in December 2021.  Enin Decl. Ex. 1, at 5-6.  ECF No. 39-1.  As a result, Zadeh Kicks accepted preorder sales for over 600,000 pairs of sneakers, resulting in payments of over $70 million.  *Id.* at 6.  Malekzadeh had no way of acquiring the quantity needed to fill the number of preorders since they were not that many available on the open market, nor did he have the money to purchase 600,000 pairs of shoes, even if they had been available for purchase."  *Id.*  Ultimately, Zadeh Kicks acquired just over 6,000 pairs of the Nike Air Jordan 11 Cool Grey shoes and customers were "either left with unfulfilled orders or they received a combination of cash refund and a gift card," while Malekzadeh spent proceeds from the preorders on luxury goods, including several million dollars on high-end automobiles; over $3 million paid for luxury bags, purses, and other items; a large quantity of jewelry; several furs; and over $6 million for high-end watches.  *Id.*

On July 29, 2022, Malekzadeh was indicted in federal court, *United States v. Michael Malekzadeh*, Case No. 6:22-cr-00262-MC, and charged with wire fraud, conspiracy to commit bank fraud, and money laundering in connection with his operation of Zadeh Kicks.  Malekzadeh Decl. ¶ 2; Ex. 1.  ECF No. 38.  In March 2025,

Malekzadeh pleaded guilty to the charges of wire fraud and conspiracy to commit bank fraud. Malekzadeh Decl. Exs. 2, 3. As of the time of this opinion, Malekzadeh is awaiting sentencing.

## II.  Defendants' Dealings with Zadeh Kicks

Defendants were among the individuals and entities who purchased preorders of sneakers from Zadeh Kicks. In Stapleton's review of Zadeh Kicks' finances between January 2020 and April 2022, Stapleton determined that Defendants received more money from Zadeh Kicks than they had paid. Stapleton Decl. ¶ 10. In that period, Zadeh Kicks received a total of $16,699,908 from Defendants and, in return, Defendants received $70,515 in shoes and $17,587,230 in funds, "which resulted in a net total gain to Defendants in the amount of $957,837." Davis Decl. ¶ 7.

At his deposition, Halavi testified that at times "instead of taking inventory [he] was reimbursed," meaning that Zadeh Kicks would buy back the preorders from Halavi. Enin Decl. Ex. 2, at 3-4. Halavi acknowledged that the "buy back" price was higher than what Halavi had originally paid for them. Enin Decl. Ex. 2, at 4.

Halavi testified that Malekzadeh would send out a "mass email" to reach out to multiple purchasers and inform them that "he was starting to do buyback, and the alternative would be to wait for delivery." Second Enin Decl. Ex. 1, at 3. ECF No. 46. Halavi testified that, in these communications, Malekzadeh would not disclose that he could not deliver the shoes but rather presented Halavi and other purchasers with the option to either accept a buy back or wait for delivery. *Id.*

## DISCUSSION

In cases involving Ponzi schemes, "[f]raudulent conveyance suits, often called 'clawback' actions, seek to recover false returns received by winning investors so that the excess proceeds can be redistributed to losing investors." *In re EPD Investment Co., LLC*, 114 F.4th 1148, 1157 (9th Cir. 2024). This is such a clawback action.

Stapleton, as receiver for Zadeh Kicks, brings claims for (1) avoidance of constructive fraudulent transfers pursuant to ORS 95.230 and 95.240; and (2) unjust enrichment. Through these claims, Stapleton seeks to claw back the $957,837 in "net gain" that Defendants received through their dealings with Zadeh Kicks. In the alternative, Stapleton seeks summary adjudication on the issue of whether Zadeh Kicks operated as a Ponzi scheme and whether Defendants were "net winners" in the scheme.

### I.    Evidentiary Objections

Stapleton has objected to the Halavi Declaration in its entirety and has raised specific objections to individual paragraphs. "When evidence is not presented in an admissible form in the context of a motion for summary judgment, *but it may be presented in an admissible form at trial*, a court may still consider that evidence." *Burch v. Regents of the University of California*, 433 F. Supp.2d 1110, 1120 (E.D. Cal. 2006) (emphasis in original). Courts need not "address the entire laundry list of objections the parties raised," but will focus instead "on documents or evidence that it relied on to determine where there's a genuine issue of material fact in dispute." *Freitag v. Valerias*, Case No. 21-cv-1625-LAB-AHG, 20204 WL 1355146, at *6 (S.D.

Cal. Mar. 29, 2024). In addition, objections that are based on the grounds of the challenged exhibit being irrelevant, speculative, argumentative, or that it constitutes an improper legal conclusion are duplicative of the summary judgment standard. *Id.* (citing *Burch*, 433 F. Supp.2d at 1119; *Cherewick v. State Farm Fire & Cas.*, 578 F. Supp.3d 1136, 1156 (S.D. Cal. 2022); *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021)).

Here, Stapleton objects that the Halavi Declaration is irrelevant and that portions of the declaration are legal conclusions are duplicative of the summary judgment standard. The parties may be assured that the Court will not rely on irrelevant materials or on statements amounting to legal conclusions in ruling on a motion for summary judgment. Such statements will not suffice to create a triable dispute of material fact.

Stapleton's other objections concern a lack of foundation and a lack of personal knowledge. "Objections predicated upon Federal Rule of Evidence 901 are appropriate in the context of a motion for summary judgment," and for evidence to be admissible, "Federal Rule of Evidence 901(a) requires a proper foundation be laid to authenticate the item by evidence sufficient to support a finding that the item is what the proponent claims it is." *Cherewick*, 578 F. Supp.3d at 1155 (internal quotation marks and citation omitted). Such a foundation may be laid by testimony of a witness who has personal knowledge and, to be considered in summary judgment, "documents must be authenticated by and attached to an affidavit that meets the requirements

of Rule 56(e) and the affiant must be a person through whom the exhibits court be admitted into evidence." *Id.*

Here, Halavi affirms in his declaration that the contents are based on his own personal knowledge and that he prepared the attached documents. Halavi Decl. ¶¶ 2-3. The Court overrules Stapleton's objections on the basis of a lack of foundation or personal knowledge. However, as the Court noted earlier, many of the statements in the Halavi Declaration and its exhibits are still susceptible to being discounted on the basis that they are not relevant under the summary judgment standard or that they are merely statements of legal conclusions.

## II.    Zadeh Kicks was a Ponzi Scheme

A Ponzi scheme is a form of financial fraud in which "no legitimate profit-making business opportunity exists," and under which the operator of the scheme uses money from new investors to pay old investors "while cultivating the illusion of a legitimate profit-making business." *In re EPD Investment Co., LLC*, 114 F.4th at 1156; *see also In re Agricultural Research and Technology Grp., Inc.*, 916 F.2d 528, 536 (9th Cir. 1990) ("Distributing funds to earlier investors from the receipt of monies from later investors is the hallmark of Ponzi schemes.").

The Ninth Circuit's definition of Ponzi scheme "recognizes two essential elements": (1) the funneling of money from new investors to pay old investors; and (2) that no legitimate profit-making business opportunity exists. *In re EPD*, 114 F.4th at 1159. Both are objective factors. *Id.*

"By definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless" and "[w]hen the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership." *In re EPD*, 114 F.3d at 1156. "Because a pyramid scheme relies on an impossibility—a limitless pool of new investors—a Ponzi scheme operator must know all along *from the very nature of his activities*, that investors at the end of the line will lose their money." *Id.* at 1160 (internal quotation marks omitted, emphasis in original). Because the Ponzi scheme does not generate profits sufficient to meet the promised returns, "but rather use investor money to pay returns, they are insolvent and become more insolvent with each investor payment." *Id.* (internal quotation marks and citation omitted).[2]

That is what happened to Zadeh Kicks: the company became insolvent almost immediately after embarking on the scheme and eventually collapsed in early 2022 and went into receivership, while Malekzadeh himself ended up facing federal fraud charges.

The use of the term "investor" in the caselaw should not be read restrictively to mean equity investors in a company. In *EPD*, the Ninth Circuit held that "[t]here is no question that lenders can be victims of a Ponzi scheme as a matter of law," and that many Ponzi schemes "rely on loans and short-term promissory notes as opposed

---

[2] Although not necessarily definitional to a Ponzi scheme, a common feature of the scheme is the use of investor money for personal expenses by the Ponzi scheme operator. *In re EPD*, 114 F.4th at 1162. In the case of Zadeh Kicks, Malekzadeh drew lavishly on the proceeds of the scheme to purchase personal luxuries.

to equity investments, including Charles Ponzi's eponymous scheme itself." *In re EPD*, 114 F.4th at 1161.

Here, the individuals and entities who preordered sneakers through Zadeh Kicks, including Defendants, stand in the place of the "investors," because they advanced money to Zadeh Kicks in the expectation of eventually receiving unreleased and/or difficult-to-acquire shoes for lower-than-retail prices. The scheme maintained the illusion of being a legitimate business, despite delivering only a small fraction of the ordered shoes, by offering "buybacks" of preorders to satisfy certain preorder customers and it funded the buybacks using the proceeds of later preorders. Zadeh Kicks, meanwhile, became insolvent shortly after instituting the scheme and only became more insolvent over the following two years, ultimately (and as the Ninth Circuit has noted, inevitably) culminating in the collapse of the scheme.

Here, the uncontradicted evidence in the record clearly establishes that Zadeh Kicks was a Ponzi scheme and, in the manner of such schemes, there are "winning" investors who realized profits greater than their principal and "losing" investors, whose principal was used to pay the profits of the winning investors.

## III.    Avoidance of Constructive Fraudulent Transfers

Stapleton's first claim seeks to avoid constructively fraudulent transfers pursuant to ORS 95.230(1)(b) and ORS 95.240(1). ORS 95.230, which is part of Oregon's adoption of the Uniform Fraudulent Transfer Act ("UFTA") provides:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor;

    (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

    (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

ORS 95.230(1).

> ORS 95.240, in turn, provides:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

ORS 95.240 (1).

## A. Stapleton has not sought summary judgment on a claim not pleaded in the Complaint.

As a preliminary matter, the Court must address Defendants' argument that Stapleton is seeking summary judgment on claims not pleaded in the Complaint. This is not the case. The Complaint, ECF No. 1-1, alleges a claim for avoidance of constructive fraudulent transfers under ORS 95.230(1)(b) and ORS 95.240(1). Compl. ¶¶ 15-19. Stapleton seeks summary judgment on the avoidance of constructive fraudulent transfers, citing specifically to ORS 95.230(1)(b). Pl. Mot. 9. Stapleton notes that, because Zadeh Kicks was a Ponzi scheme, Stapleton might have been able to prevail on a claim for actual fraudulent transfer pursuant to ORS 95.230(1)(a), Pl.

Reply 3, but that claim is not alleged, and Stapleton does not seek summary judgment on an unalleged claim.

The Ninth Circuit explained the difference between a claim for actual fraudulent transfer and constructive fraudulent transfers as follows:

> In the context of a Ponzi scheme, whether the receiver seeks to recover from winning investors under the actual fraud or constructive fraud theories generally does not impact the amount of recovery from innocent investors. Under the actual fraud theory, the receiver may recover the entire amount paid to the winning investor, *including* amounts which could be considered "return of principal." However, there is a "good faith" defense that permits an innocent winning investor to retain funds up to the amount of the initial outlay. Under the constructive fraud theory, the receiver may only recover "profits" above the initial outlay, unless the receiver can prove a lack of good faith in which case the receiver may *also* recover the amounts that could be considered return of principial. The Seventh Circuit has suggested that the only practical distinction between these theories of recovery is the allocation of burdens of proof.

*Donnel v. Kowell*, 533 F.3d 762, 771 (9th Cir. 2008) (internal citations omitted, emphasis in original).

Here, as discussed in the previous section, Stapleton has established that Zadeh Kicks was a Ponzi scheme. Stapleton only seeks to recover Defendants' profits from their dealing with Zadeh Kicks and does not seek "amounts that could be considered return of [Defendants'] principal." Relatedly, Stapleton does not seek to prove that Defendants acted with a lack of good faith.[3] This is entirely consistent with a claim for avoidance of a constructively fraudulent transfer under ORS 95.230(1)(b).

---

[3] For that reason, Defendants arguments that they acted in good faith are not relevant to the specific claim at issue—avoidance of a constructively fraudulent transfer.

To the extent that Defendants contend that the existence of a Ponzi scheme is not alleged, their argument is not supported. Facts supporting the existence of a Ponzi scheme are alleged in the Complaint. Compl. ¶¶ 5-14.

The Court concludes that Stapleton does not seek summary judgment on a "new" claim.

## B. Defendants are "Net Winners" in the Zadeh Kicks Ponzi scheme and must disgorge their profits from the scheme

"Courts have routinely applied UFTA to allow receivers or trustees in bankruptcy to recover monies lost by Ponzi-scheme investors." *Donell*, 533 F.3d at 767.[4] In such a situation, the "Ponzi scheme operator is the 'debtor' and each investor is a 'creditor,'" while "the 'profiting investors' are the recipients of the Ponzi scheme operator's fraudulent transfer." *Id.*

Under a constructive fraud theory, as here, "the receiver alleges that the transfer of 'profits' to the winning was made without receiving a reasonably equivalent value in exchange for the winning investor's initial investment." *Donell*, 533 F.3d at 770 (internal quotation marks and citation omitted, alterations normalized); Compl. ¶ 16. "Proof that the transfers were made pursuant to a Ponzi scheme generally establishes that the scheme's operator was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or intended to

---

[4] In *Donell*, a receiver sought to force an innocent winning investor to disgorge his profits from a Ponzi Scheme. *Donell v. Kowell*, 533 F.3d 762, 766 (9th Cir. 2008). The Ninth Circuit was applying California's version of the UFTA, Cal. Civ. Code. § 3439.04(a), which is substantially the same as the Oregon version of the same UFTA provision, ORS 95.230(1). *Id.* at 767.

incur or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." *Donell*, 533 F.3d at 770-71. Here, as previously discussed, the Court has concluded that Zadeh Kicks was operating as a Ponzi scheme.

To determine if a creditor is liable, courts first use the "netting rule," meaning that sums "transferred by the Ponzi scheme perpetrator to the investor are netted against the initial amounts invested by that individual," and if the result is positive, "the receiver has established liability and the court then determines the amount of the liability, which may or may not be equal to the net gain," depending on certain factors. *Donell*, 533 F.3d at 771. Next, "to determine the actual amount of the liability, the court permits good faith investors to retain payments up to the amount invested, and requires disgorgement of only the 'profits' paid to them by the Ponzi scheme." *Id.* at 772. "Payments up to the amount of the initial investment are considered to be exchanged for 'reasonably equivalent value,' and thus not fraudulent, because they proportionally reduce the investor's rights to restitution," but if the creditor received more than he put into the scheme, those payments "are considered fictitious profits because they do not represent a return on legitimate investment activity." *Id.* (internal quotation marks and citation omitted); *see also In re EPD*, 114 F.4th at 1157 ("Where causes of action are brought against Ponzi scheme investors, the general rule is that to the extent innocent investors received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers." (internal quotation marks and citation omitted)).

In this case, the receivership's accounting experts conducted a review of Zadeh Kick's operations and found that "[f]rom January 2020 through April 2022, Zadeh received a total of $16,699,908 from Defendants," while Defendants received from Zadeh "$70,515 in shoes and $17,587,230 in funds, which resulted in a total net gain to Defendants in the amount of $957,837," and that Defendants received this net amount during the period in which Zadeh Kicks was a Ponzi scheme. Davis Decl. ¶ 7. Defendants' "profit" from the scheme was $957,837.

Defendants assert, both in their motion and in response to Stapleton's motion, that the funds they received from Zadeh Kicks were "settlements of debts owed by Zadeh for non-delivery of the shoes," and that funds were "applied to satisfy and settle the debts owed by Zadeh for non-delivery of the shoes, even though the settlement payments were for amounts slightly less than the debt owing to Defendants based upon the prevailing market prices for such shoes according to stockx.com." Halavi Decl. ¶ 6. Defendants assert that they "fully credited against the debt owed to Defendants by Zadeh, dollar for dollar, all payments made by Zadeh to Defendants as 'settlement payments' for debts that were owed by Zadeh to Defendant for the market value of the undelivered shoes." *Id.* at ¶ 9. Defendants further contend that, by accepting the money in full satisfaction of the alleged debts, "Zadeh received a greater benefit than the amounts paid by Zadeh, because the market value of the undelivered shoes in each transaction . . . was higher than the amounts paid as settlement by Zadeh as settlement of the debts owed for non-delivery." *Id.* ¶ 9.

There are several issues with this argument. First, Halavi testified that Defendants were presented with the option of choosing between accepting the buyback from Zadeh Kicks or waiting for delivery and Defendants opted to accept the buyback. Second Enim Decl. Ex. 1, at 2. Despite claiming that the net gain over the amounts paid in deposits to Zadeh Kicks were "settlements," Halavi does not identify any contractual delivery date by which Zadeh Kicks was obligated to deliver the shoes. *See* Halavi Decl. ¶ 6 (claiming that delivery dates were indicated on the website, but not providing a single such date). Halavi also testified in his deposition that Zadeh Kicks did not tell him they could not deliver the shoes. Second Enim Decl. Ex. 1, at 3. In addition, Halavi's communications with Zadeh Kicks refer to taking a cash buyback and using it to purchase more preorders as "reinvesting" and taking the buybacks as "cashing out." Second Stapleton Decl. Ex. 4, at 1-2.[5] No reasonable juror could conclude that these payments were settlement of an existing debt. There was no reasonably equivalent exchange of value for the excess funds Defendants received from Zadeh Kicks and, as in *Donell*, Defendants' net winnings are "fictitious profits" from the Ponzi scheme.

---

[5] In the same emails, Halavi referred to using cash from buybacks to "reinvest" in more preorders and assured Zadeh Kicks he was "committed to growing the pot we have." Second Stapleton Decl. Ex. 4, at 4; *see also* Ex. 4, at 1(Halavi emails Zadeh Kicks: "For the remainder (minus 50 pairs I'll take inventory on) I'd like to sell back at $210 which I'd wire right back to you *as per our usual arrangement*." (emphasis added) and "Our last 2 deals each increased by $1 million, and this next one would be $1.5 million. It's not new funds but I'm making a conscious effort to keep growing the pot I have with you so there's growth on both sides. Part of me pulling this cash is actually an attempt to secure more financing for our deals.") and 2 (Halavi emails Zadeh Kicks: "I am trying to grow what we have as fast as we can, which is why the past couple orders have required me to pull a bit of cash out as a proof of concept. This won't be a common occurrence in the future."). These communications contradict Halavi's current unsupported contention that the buyback sums from the scheme were "settlements" of an existing debt.

Defendants also argue that they were not "investors" in Zadeh Kicks, but that terminology is not derived from the statute and there is no need for a Ponzi scheme to rely on equity investors as its victims.[6]  As the Ninth Circuit observed in *Donell*, the UFTA's terms "are abstract in order to protect defrauded creditors, no matter what form a Ponzi scheme or other financial fraud might take." *Donell*, 533 F.3d at 774; *see also In re EPD*, 114 F.4th at 1161 (holding that there was "no question" that lenders could be victims of a Ponzi scheme and that many such schemes rely on loans and "short-term promissory notes as opposed to equity investment.").  By entering into a series of preorders with Zadeh Kicks, Defendants became one of the company's creditors and, by accepting buybacks in excess of the amount of the preorders, they became one of the "net winners" among Zadeh Kick's creditors.

Defendants also stress their good faith as purchasers of preorders.  Defendants' good faith is not disputed by Stapleton, but the argument is unavailing.  "[C]ourts have long held that [it] is more equitable to attempt to distribute all recoverable assets among the defrauded investors who did not recover their initial investments rather than to allow the losses to rest where they fell." *Donell*, 533 F.3d at 776.  As good faith purchasers, Defendants' liability is limited only to the money they received in excess of what they paid to Zadeh Kicks and, indeed, that is all Stapleton seeks in this action.

---

[6] The Court notes that in communications with Zadeh Kicks, Halavi repeatedly referred to taking cash buybacks and using them to purchase additional preorders as "reinvesting."  Second Stapleton Decl. Ex. 4.

In sum, the transfer of money from Zadeh Kicks to Defendants in excess of the preorder amounts paid by Defendants was not exchanged for reasonably equivalent value. That this was done during the existence of a Ponzi scheme establishes fraudulent intent. The net winnings realized by Defendants were in excess of Defendants' principal investment in the scheme and exchanged not for equivalent value. Stapleton has demonstrated that Zadeh Kicks was insolvent at all material times, satisfying the showing required for avoidance of a constructive fraudulent transfer. As previously discussed, Stapleton does not dispute that Defendants are an innocent investor.

Stapleton is entitled to summary judgment on his claims for avoidance of a constructively fraudulent transfer and Defendants must disgorge their profits in the amount of $957,837.

## IV.   Unjust Enrichment

For claims of unjust enrichment, the Oregon Supreme Court utilizes a case-by-case analysis, replacing its previous formulaic approach. *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 126-28 (2017). Courts are directed to "examine the established legal categories of unjust enrichment as reflected in Oregon case law and other authorities to determine whether any particular enrichment is unjust." *Id.* at 132. "In so ruling, Oregon's Supreme Court established that the Restatement (Third) of Restitution and Unjust Enrichment (2011) is proper authority when considering whether unjust enrichment allegations fall within an established category."

*BenefitElect, Inc. v. Strategic Benefit Sols. Corp.*, 614 F. Supp.3d 838, 845 (9th Cir. 2022).

Here, courts in the District of Oregon have already held, in the context of a Ponzi scheme clawback action, that a "transfer induced by fraud is subject to recission and restitution as a source of unjust enrichment." *Greenspan for Receivership Entity v. Anchor Capital Mngmt. Grp., Inc.*, 3:21-cv-954-JR, 2023 WL 7181677, at *3 (D. Or. Sept. 27, 2023) (citing *Larisa's Home Care*, 362 Or. at 133). The Court concurs and concludes that because the transfers were induced by fraud on the part of Zadeh Kicks as part of its ongoing Ponzi scheme, the funds paid to Defendants in excess of their principal constitutes unjust enrichment and Defendants must disgorge those profits to Stapleton so that they may be redistributed to the scheme's losing investors through the receivership process.

Stapleton is entitled to summary judgment on the claim for unjust enrichment and Defendants must disgorge their profits from the Zadeh Kicks transactions in the amount of $957,837.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment, ECF No 35. is GRANTED and Defendants' Motion for Summary Judgment, ECF No. 41, is DENIED.   Judgment is for Plaintiff in the amount of $957,837.00, which constitutes Defendants' net gain from the transactions with the Zadeh Kicks Ponzi scheme.   Final judgment shall be entered accordingly.

It is so ORDERED and DATED this ____4th_____ day of December 2025.


 /s/Ann Aiken
ANN AIKEN
United States District Judge